UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TANESHA DAVIS,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br>　　　　　Defendant. | Case No.  14-cv-03870-JSC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR CROSS-SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 18 & 19 |

Plaintiff Tanesha Davis seeks social security disability benefits for depression, panic disorder, and obsessive compulsive disorder.  Pursuant to Title 42 of United States Code Section 405(g), Plaintiff filed this lawsuit for judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying her benefits claim.  Now before the Court are Plaintiff's and Defendant's Motions for Summary Judgment. (Dkt. Nos. 18, 19.)  Because the Administrative Law Judge ("ALJ") did not commit legal error and Plaintiff has not demonstrated that additional evidence could impact the ALJ's decision, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's cross-motion for summary judgment is GRANTED.

## LEGAL STANDARD

A claimant is entitled to disability insurance benefits if she can demonstrate that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that can be expected to result in death or last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1).

The ALJ conducts a five-step sequential inquiry to determine whether a claimant is entitled to benefits.  20 C.F.R. § 416.920.  At the first step, the ALJ considers whether the claimant is currently engaged in substantial gainful activity, the second step asks if the claimant has a severe

impairment or combination of impairments (i.e., an impairment that has a significant effect on the claimant's ability to function); if the claimant has a severe impairment, the third step asks if the claimant has a condition which meets or equals the conditions outlined in the Listings of Impairments in Appendix 1 of the Regulations (the "Listings"); if the claimant does not have such a condition, the fourth step assesses the claimant's residual functional capacity ("RFC") and determines whether the claimant is still capable of performing past relevant work; if the claimant is not capable of performing past relevant work, the fifth and final step asks whether the claimant can perform any other work based on the claimant's residual functional capacity, age, education, and work experience. *Id.*; §§ 404.1520(b)-404.1520(f)(1).

### THE ADMINISTRATIVE RECORD

Plaintiff was born on February 11, 1981.  (AR 273.)  She has a boyfriend and no children, and she lives alone.  (AR 60-62, 88.)  Plaintiff completed the ninth grade and did not graduate from high school.  (AR 74.)  Plaintiff worked as a security guard from 2001 to 2002, a cashier from 2002 to 2003, a fast food worker in 2006, and a counselor from 2006 to 2008.  (AR 321.)  She has not worked since she was laid off on September 8, 2008.  (AR 277.)  Plaintiff alleges in her undated initial disability report that she became disabled on the date she was laid off, when she was 27-years-old, due to depression, panic disorder, and obsessive compulsive disorder. [1]  (*Id.*)

In July 2010, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVII, respectively.  (AR 220-229.)  The applications were denied initially in January 2011, on reconsideration in June 2011, and after a hearing by an ALJ in January 2013.  (AR 8-27, 104-114.)  The Appeals Council denied Plaintiff's request to review the ALJ's decision in June 2014, making the ALJ's decision the final decision of the Commissioner.  (AR 1-6.)  Thereafter, Plaintiff commenced this action for judicial review pursuant to Title 42 of United States Code Section 405(g).  (Dkt. No. 18.)

### I.    Medical Evidence

The medical evidence begins in October 2008 when Plaintiff was admitted to the emergency room at Eden Medical Center following "ETOH" (alcohol) abuse.  (AR 563.)  Plaintiff

---

[1] In her motion for summary judgment, Plaintiff suggests that she has additional disabilities including, rheumatoid arthritis, a "bad back," social anxiety, bipolar disorder, hypertension disorder, and that she suffers side effects from many medications.  (Dkt. No. 18 at 2.)

was diagnosed with reactive depression and prescribed Ativan (also referred to as "Lorazepam" elsewhere in the record) for anxiety.  (AR 573.)  Between 2008 and 2011, Plaintiff had seven additional emergency room visits.[2]  (AR 562, 365, 377, 344, 358, 353, 348, 493.)  In all these emergency room visits, alcohol was present, whether in the diagnosis or as a modifying factor.  Six of the visits noted that Plaintiff was suffering from "alcohol withdrawal," "alcohol intoxication," "alcohol dependence," "alcoholism," and/or "alcohol abuse," alternatively.  (AR 366, 378, 345-46, 359, 354, 493.)  In two of these visits, Plaintiff was also diagnosed with "anxiety," and in another visit, Plaintiff was prescribed Zoloft for depression.  (AR 354, 493, 346.)  On one occasion, Plaintiff was also placed on a 5150 hold and diagnosed with "depressive disorder" and "anxiety disorder."  (AR 378.)  While on the 5150 hold, Plaintiff was initially "combative" and was placed in restraints to keep her from striking at medical staff.  (AR 545-46, 559.)  Aside from these six emergency room visits, Plaintiff had one other emergency room visit wherein she was diagnosed with "anxiety," the severity of which the doctor noted as "moderate."  (AR 348.)  ETOH was listed as a modifying factor.  (AR 348.)

Plaintiff's bloodwork was positive for marijuana in two of the emergency room visits listed in the record.  (AR 565, 552.)  If she was tested for marijuana in her other emergency room visits, those bloodwork records do not appear within the record.  Nonetheless, at another emergency room visit, she admitted to using marijuana at least once a week.  (AR 377.)  Moreover, at her hearing, Plaintiff testified that she occasionally uses marijuana to relieve her anxiety.  (AR 88.)  She had a medical marijuana card, which expired in April 2010.  (AR 602.)

Four emergency room visits in the record are not discussed above.  This is because Plaintiff, through counsel, advised the ALJ that the records at exhibit 3F pages 11-24 were for her sister Chantel Davis.  (AR 327.)  Plaintiff's counsel also stated that exhibit 3F pages 16-27 were attributable to Plaintiff's sister.  (AR 60.)  Those records pertain to the medical events in the record occurring on July 19, 2009 (AR 396-400); December 21, 2009 (AR 391-395); and September 1, 2010 (AR 384-390.)   The record also contains information regarding a medical event on August 31, 2010 which also likely pertains to Plaintiff's sister.[3]  (*See* AR 533-543.)

---

[2] The dates of all eight emergency room visits are October 16, 2008; October 17, 2008; November 3, 2008; November 20, 2008; April 28, 2009; June 11, 2009; July 31, 2009; July 17, 2011.
[3] The September 1, 2010 medical event that Plaintiff's counsel identified as pertaining to

United States District Court
Northern District of California

1   The only evidence of routine medical care in the record is from Dr. Adrian James at the

2   West Oakland Health Center and Nurse Joyce Morgan at Save a Life Wellness Center.  (AR 578,

3   576, 594, 586, 592, 582-84, 600.)  Although Plaintiff contended before the ALJ that Dr. James was

4   her treating physician for the past eight years, the administrative record contains very little

5   documentation from Dr. James.  (AR 326.)  Indeed, Dr. James provided only six pages of medical

6   records for services rendered between 2010 and 2011, and several illegible screen shots listing

7   office visits dated from November 2004 to September 2011, which Plaintiff had transcribed.  (AR

8   576-581, 605-613.)  The third column of the transcriptions lists conditions—for example, "anxiety,

9   depression," "arthritis[;]" however, it is unclear if these conditions are diagnoses or Plaintiff's

10  complaints to the doctor, and no other information is provided beyond a condition's name and the

11  date of an office visit.  (*Id.*)  As for the medical records themselves, they list only three visits from

12  2010 to 2011.  At Plaintiff's September 2010 appointment, Dr. James's impression was that

13  Plaintiff had anxiety and depression; he noted that she used marijuana once a day and had recently

14  punched her fist through a glass table.  (AR 578.)  He prescribed Plaintiff Paxil—which is used to

15  treat depression, anxiety disorder, and obsessive compulsive disorder, among other conditions—and

16  Ativan.  (*Id.*, *see Paroxetine*, PubMed Health (July 16, 2015),

17  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011606/?report=details#side_effects.)  Almost

18  a year later, in August 2011, Dr. James noted that his appointment with Plaintiff was cancelled.

19  (AR 577.)  Finally, in September 2011, Dr. James noted that Plaintiff had "hip arthritis" and

20  prescribed Tylenol for pain relief.  (AR 594.)

21  A little over six months later Plaintiff began seeing Nurse Morgan at Save a Life Wellness

22  Center.  (AR 595.)  During her first visit in May 2012, Nurse Morgan assessed Plaintiff as having

23  "anxiety," "bipolar [sic]," "panic attacks," and "HTN," which stands for "hypertension."  (*Id.*)  In

24  the "Review of Systems and Past Medical History" section of a check-box form, Nurse Morgan

25  indicated that Plaintiff has or had "R.A.," which presumably stands for "rheumatoid arthritis," and

26  "[d]epression."  (AR 586.)  In a September 2012 visit, Nurse Morgan assessed Plaintiff as having

---

Plaintiff's sister occurred at the John George Psychiatric Pavilion, and the intake evaluation was
completed at 10:29 a.m. that day—about two hours after the August 31, 2010 records indicate the
patient was transferred to the John George Psychiatric Pavilion.  (AR 386.)  The September 1,
2010 records also describe similar hand injuries as those discussed in the August 31, 2010 records.
(Compare AR 384 to AR 541.)

"rheumatoid arthritis," "depression," "anxiety," and "HTN." (AR 583.) A month later, Nurse Morgan again assessed Plaintiff as having "arthritis." (AR 601.)

As set forth below, between November 2010 and October 2012, Plaintiff was seen by or her medical record was examined by numerous physicians and psychiatrists and a nurse at the request of the Department of Social Services and in connection with Plaintiff's DIB and SSI applications.

In November 2010, Plaintiff was examined twice: first by Dr. Stephen Trichter, and then by Dr. Terrance Flanagan two days later. (AR 401, 406.) Both doctors are with the Sunnybrook Medical Group. (*Id.*) Dr. Trichter saw Plaintiff for a mental status examination. (AR 401.) Plaintiff arrived late for the examination and claimed she woke up depressed that morning and that her depression was worsening. (*Id.*) Dr. Trichter's diagnostic impression of Plaintiff was that she has "mood disorder NOS," "anxiety disorder NOS," and "panic disorder." (AR 404.) At the time of her evaluation, Plaintiff was taking Zoloft, Ativan, and one other medication, the name of which Plaintiff could not remember. (AR 402.) The doctor noted that there was no "suicidal, homicidal, or paranoid ideation during the interview." (AR 404.)

Dr. Trichter wrote that the degree to which Plaintiff's "mental health impairs daily functioning appear[ed] moderate." (*Id.*) In his opinion, Plaintiff's mental condition "probably will not abate[,]" and Plaintiff's medical history indicates she had a "level of limited motivation and follow-through." (*Id.*) Nonetheless, Dr. Trichter wrote that "claimant's level of functioning will most likely improve with ongoing therapy and/or medication to manage mental health symptoms." (*Id.*) Moreover, even though Plaintiff had some history of injurious behavior and of being a danger to others, she had no history of being gravely disabled and "denied having physical limitations due to medical problems." (AR 402-03.)

Dr. Trichter's functional assessment of Plaintiff was eight-fold. According to Dr. Trichter, at the time of his evaluation, Plaintiff was (1) able to "understand, remember, and carry out simple one or two step instructions[;]" (2) unable to complete "detailed and complex instructions[;]" (3) mildly "limited in her ability to relate and interact with co-workers and the public[;]" (4) moderately limited in her ability to "maintain concentration and attention, persistence and pace[;]" (5) moderately limited in her ability to "associate with day-to-day work activity, including

attendance and safety[;]" (6) moderately limited in her ability to "accept instructions from supervisors[;]" (7) moderately limited in her ability to "maintain regular attendance in the work place and perform work activities on a consistent basis[;]" (8) moderately affected in her ability to "perform work activities without special or additional supervision." (AR 404-05.) Overall, Dr. Trichter found Plaintiff "moderately limited in functioning" and capable of handling funds. (AR 405.)

Two days later, Dr. Flanagan conducted a complete orthopedic evaluation of Plaintiff. (AR 406.) At the evaluation, Plaintiff complained that she had been experiencing "multijoint arthralgias and diffuse muscular pain" from the time she was born. (AR 407.) She also claimed that the pain was worse when she sat, stood, walked, bent, or lifted. (*Id.*) Plaintiff said that, in the past, a physician told her that her joint pains were the result of arthritis. (*Id.*) At the time of the evaluation, Plaintiff was taking Zoloft, Ativan, and an "unknown pain medication." (*Id.*)

Notwithstanding Plaintiff's complaints, Dr. Flanagan found Plaintiff was in "no acute distress." (*Id.*) In fact, with regard to Plaintiff's "station and gait," he noted:

> The claimant sits and stands with normal posture. There is no evidence of any tilt or list, and the claimant sits comfortably during the examination. In obtaining the upright position, the claimant rises from a chair without difficulty. The gait is normal. The claimant is unable to walk on tiptoes and heels, although there is no evidence of weakness in the ankle flexors or extensors. The claimant walks across the exam room without difficulty. The claimant uses no assistive devices to ambulate and is able to get on and off the examining table without difficulty.

(AR 408.) Dr. Flanagan further noted that there was a "smooth range of motion of all the joints except the neck and lower back limited secondary to pain. There [was] no evidence of crepitance, swelling, erythema, subluxation, or contracture." (AR 409.)

Dr. Flanagan diagnosed Plaintiff with "cervical myofascial strain" and "lumbar myofascial strain," and attributed these conditions to Plaintiff's neck and lower back pain; however, the doctor noted that "no specific limitations are indicated" based on his examination. (AR 410.) As to Plaintiff's other joints, Dr. Flanagan's impression was that "there [was] nothing on examination [at the evaluation] to substantiate a diagnosis . . . ." When Plaintiff was asked about the lack of findings for these joints, she replied that the pain was "often intermittent in nature and that she had recently taken pain medication, which alleviated these joint pains considerably." (*Id.*)

United States District Court
Northern District of California

Approximately two months later, in January 2011, Dr. Preston Davis conducted a mental residual functional capacity assessment, psychiatric review technique, and case analysis using Plaintiff's medical reports.  (AR 417, 420, 433.)  Dr. Davis did not personally examine or speak with Plaintiff; he based his findings on previous medical reports, giving great weight to the opinions of Drs. Flanagan and Trichter.  (AR 431.)  In his mental residual functional capacity assessment, Dr. Davis wrote the following:

> The clmt can understand, remember, & carryout simple & repetitive wk instructions. She  can sustain her concentration, pace, & her persistence w/her wk tasks for 2 hr blocks of time, w/customary breaks, over the course of a regular wkday/wk. She can interact w/supervisors & w/cowkers she knows well. The clmt has mood & residual or ongoing DAA problems. She would have difficulty coping w/the stress of having to consistently interact w/the general public. She can perform her wk tasks w/little general public contact. The clmt can adapt to a wk setting that is simple & routine.

(AR 419.)  Moreover, in his psychiatric review technique, he wrote that the Plaintiff was not physically limited and was "able to do all ADLs."[4] (AR 431-32.)  Although Dr. Davis noted that Plaintiff may suffer from "cervical myofacial strain and lumbar myofacial strain," Plaintiff had no other medical records indicating physical problems.  (AR 431.)   Dr. Dais's case analysis provided, materially, the same information as his psychiatric review technique.  (AR 436.)

Later that month, in January 2011, Dr. Melvin Roberts produced a one paragraph case analysis of Plaintiff's case.  (AR 438.)  Dr. Roberts did not note whether he personally examined or spoke with Plaintiff; however, he noted that he "carefully reviewed and evaluated" Dr. Flanagan's November 2010 evaluation of Plaintiff.  (*Id.*)  Dr. Roberts simply concluded that his evaluation of Plaintiff's records permitted a "[n]on-severe functional status to be allowed."  (AR 438.)

Several months later, in June 2011, Dr. L.C. Chiang conducted a case analysis of Plaintiff's case.  (AR 474.)  Dr. Chiang reviewed Dr. Flanagan's and Dr. Trichter's reports and also the reports issued from "Alameda Ambulatory Care" following Plaintiff's emergency room visits.  (AR 474-75.)  Dr. Chiang's "initial findings" were that Plaintiff's physical condition was "non severe [sic]" and noted that Plaintiff should have "limited public contact."  (AR 474.)

---

[4] However, in his psychiatric review technique, Dr. Preston considered and, at least in part, relied on evidence Plaintiff's counsel stated pertains to her sister.  (AR 431.)

United States District Court
Northern District of California

Over a year later, in October 2012, Nurse Morgan completed two check-box medical assessments of Plaintiff's ability to do work-related activities. (AR 595, 598.) Nurse Morgan's first assessment was based on Plaintiff's mental conditions, and the second assessment was based on her physical conditions. (*Id.*) Nurse Morgan noted that Plaintiff was her patient since the end of May 2012. (AR 595.) The nurse did not cite to any particular medical records or note that she reviewed medical records outside of those she produced in conjunction to her own examinations of Plaintiff. (AR 595-599.)

In her mental evaluation, Nurse Morgan indicated that Plaintiff has no or poor ability to "follow work rules," "relate to co-workers," "deal with the public," "use judgment," "interact with supervisor," "deal with work stresses," "function independently," and "maintain attn./concentration" in the work setting. (AR 596.) Nurse Morgan also indicated that Plaintiff has no or poor ability to "understand, remember and carry out complex job instructions;" "understand, remember and carry out detailed, but not complex job instructions;" and "understand, remember and carry our simple job instructions." (*Id.*) With regard to Plaintiff's ability to "adjust personally and socially," Nurse Morgan indicated that Plaintiff has no or poor ability to "maintain[] personal appearance," "behave in an emotionally stable manner," "relate predictably in social situations," and "demonstrate[] reliability." Nurse Morgan also wrote that Plaintiff "has only kept two appointments" out of five. (AR 597.)

In her report regarding Plaintiff's physical conditions, Nurse Morgan indicated that Plaintiff neither used nor needed an assistive device. (AR 599.) Nonetheless, she indicated that Plaintiff could never climb, balance, stoop, kneel, crouch, and crawl. (*Id.*) Nurse Morgan further indicated that Plaintiff's impairments caused environmental restrictions with regard to "heights," "moving machinery," "temperature extreme[s]," "chemicals," "dust," and "noise." Additionally, Nurse Morgan wrote that Plaintiff was unable to use her hands to comb her hair or open twist tops, and that Plaintiff had poor dexterity. (*Id.*)

## II.     ALJ Hearing

### A.     Plaintiff's Testimony

Plaintiff's hearing took place on October 25, 2012 before ALJ Mary Parnow. (AR 56.)

8

Plaintiff was represented by counsel at the hearing.  (*Id.*)  At the time of the hearing, she was 31 and lived alone.  (AR 92.)

Plaintiff was laid off because the company she worked for closed.  (AR 75.)  However, she had problems at her job before she was laid off.  (*Id.*)  She would call "off work" "due to [her] physical and [her] emotional problems," and she received warnings and was ultimately suspended because of her absences at work.  (*Id.*)  When asked how many times a month she was absent, Plaintiff said, "Two, four, six, eight. At least 10, 12 times in a month."  (*Id.*)  Plaintiff would not go to work because of her anxiety symptoms.  (*Id.*)  As a result of her anxiety, she "would get hives," that her head would "start[] to spin," and that her heart would "start[] to beat real fast . . . ." She would argue with her employers and co-workers on a day to day basis, and that she would argue to the point she would have "panic attacks."  (AR 76.)  Plaintiff's pain from running, standing on her feet, and using her hands on the job negatively affected her job performance.  (AR 77.)  Additionally, her knees, and hip and back gave her "chronic pain," and she could not lift certain things because of the pain she would feel.  (AR 77-78.)

Plaintiff's boyfriend would drive her to work because she would get panic attacks on the bus, and she had problems walking.  (AR 77.)  In fact, she "can't walk."  (*Id.*)  Nonetheless, she could take the bus so long as it was not crowded.  (*Id.*)  Moreover, she could not drive because her "anxiety and [her] panic attacks" made her "shake when she [got] behind the wheel.  (*Id.*)

Plaintiff had no motivation to get out of bed and would stay in bed depressed.  (AR 82.)  She also lacked the drive to do any chores around the house, including grocery shopping, which her boyfriend would do for her.  (AR 83.)  Plaintiff was able to make "[s]omething simple" to eat, such as a "sandwich, [or] a quick salad . . . ."  (*Id.*)  With regard to personal care, she was unable to "do [her] own hair" because her hands would "cramp up."  (AR 84.)

B.    Medical Expert Testimony

Dr. David Glassmire, a psychologist board certified in forensic psychology, was called as a medical expert during Plaintiff's hearing.  (AR 65.)  Dr. Glassmire testified telephonically that he reviewed administrative record exhibits 1F through 27F.  (*Id.*)  Based on his review of those exhibits, he testified that Plaintiff's severe impairments are a "12.04 condition depressive disorder, not otherwise specified[;] . . . a 12.06 condition anxiety disorder, not otherwise specified[;]" and

"a 12.09 condition alcohol dependence." (AR 65-66.) The ALJ accepted these three diagnoses as severe impairments. (AR 72.) Dr. Glassmire also testified that there is an indication of marijuana use in the record. (AR 66.)

Dr. Glassmire said there were one to two episodes of decompensation in the record. (*Id.*) Although Plaintiff has ongoing depression and anxiety, nothing in the record indicated that she would have any decompensations "in the absence of the alcohol abuse." (AR 71.) Dr. Glassmire "did not see evidence for Somatoform Disorder" in the record. (AR 70-71.)

In the context of work, Dr. Glassmire recommended "limiting [Plaintiff] to simple, repetitive tasks; no interaction with the public; and no responsibility for the safety of others." (*Id.*) Dr. Glassmire agreed with Dr. Trichter's mental status examination and recited Dr. Trichter's impression that Plaintiff "was able to do simple one-to-two step instructions, but was unable to do complex tasks." (AR 68.)

C.     Vocational Expert ("VE") Testimony

The ALJ posited one hypothetical to Vocational Expert Carly Coughlin, and Plaintiff's counsel posited two hypotheticals to the VE. (AR 92.) First, the ALJ asked the VE to consider an individual who has the same age, education, and work history as the Plaintiff with the following residual functional capacity: "limited to simple repetitive tasks, with no work with the public and no responsibility for the safety of others." (AR 93.) The VE testified that this hypothetical individual would not be able to perform any of Plaintiff's past jobs. (*Id.*) However, the VE also testified that the same hypothetical individual would be able to perform other jobs in the national, state, and regional economies, including: "circuit board assembly," "hand packager," and "dry cleaner." (*Id.*) Second, Plaintiff's counsel asked the VE to consider the same hypothetical individual that the ALJ described with the addition that the individual would not be able to perform "reaching, handling or fingering." (AR 94.) The VE testified that, with these added limitations, the hypothetical individual would not be able to work. (*Id.*) Third, Plaintiff's counsel asked the VE to consider the same hypothetical individual that the ALJ described with the alternative restriction that the individual would miss one day of work a month. (AR 95.) The VE testified that this hypothetical individual would also not be able to work. (*Id.*)

III.     ALJ's Decision

The ALJ found Plaintiff not disabled under the five-step evaluation used in the disability analysis. (AR 12.) *See* 20 C.F.R. §§ 404.1520, 416.920. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. (AR 13.) At the second step, the ALJ found that Plaintiff had the severe impairments of depressive disorder, NOS; anxiety disorder, NOS; alcohol dependence; and marijuana use.[5] (*Id.*) At the third step, the ALJ found that Plaintiff did not have impairments that met or equaled a listed impairment in 20 C.F.R. Part 4040, Subpart P, Appendix 1. (AR 14.) Between the third and fourth steps, the ALJ found that Plaintiff retained the RFC to perform a "full range of work at all exertional levels but with the following nonexertional limitations: mentally, the claimant can perform simple, repetitive tasks with no public contact and no responsibility for the safety of others." (AR 16.) At the fourth step, the ALJ found that Plaintiff could not perform any past relevant work. (AR 18.) Finally, at the fifth step, the ALJ found that there was other work in the national economy that Plaintiff could perform, such as the representative occupations of circuit board assembler, of which there exist 364 jobs in the local economy and 5,000 jobs in the state economy; hand packager, of which there exist 162 jobs in the local economy and 10,000 jobs in the state economy; and dry cleaner, of which there exist 283 jobs in the local economy and 18,000 jobs in the state economy. (AR 19.) Thus, the ALJ found that Plaintiff was not disabled under the Social Security Act. (AR 20.)

## IV. Appeals Council Denied Plaintiff's Request for Review

The Appeals Council denied Plaintiff's request for review because the ALJ's findings and conclusions were not contrary to the weight of the evidence in the record. (AR 1.) Further, the Appeals Council noted that the additional evidence Plaintiff's counsel provided—a letter claiming the ALJ said she would allow Plaintiff's counsel to send a subpoena to the U.S. Attorney's Office for enforcement prior to issuing her decision and screenshots of some of Plaintiff's medical records—did not create a basis for challenging the ALJ's decision. (AR 1-2, *see* AR 603-13.) Thus, the Appeals Council denied Plaintiff's request for review.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. section 405(g), the Court has authority to review the ALJ's decision

---

[5] The ALJ also found Plaintiff's allegations of rheumatoid arthritis and joint pain since birth unsupported by the record. (AR 14.)

to deny benefits. When exercising this authority, however, the "Social Security Administration's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallenes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). The Ninth Circuit defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;" it is "more than a mere scintilla, but may be less than a preponderance." *Molina v. Astrue*, 674 F.3d 1104, 1110-11 (9th Cir. 2012) (internal citations and quotation marks omitted); *Andrews*, 53 F.3d at 1039.  To determine whether the ALJ's decision is supported by substantial evidence, the reviewing court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (internal citations and quotation marks omitted); *see also Andrews*, 53 F.3d at 1039 ("To determine whether substantial evidence supports the ALJ's decision, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.").

Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are roles reserved for the ALJ.  *See Andrews*, 53 F.3d at 1039; *Magallenes*, 881 F.2d at 750.  "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal citations and quotation marks omitted); *see also Batson v. Commissioner*, 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion.").  "The court may not engage in second-guessing." *Tommasetti*, 533 F.3d at 1039.  "It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the Commissioner's determination as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, not the Court's, to resolve conflicts in the evidence." *Bertrand v. Astrue*, No. 08-CV-00147-BAK, 2009 WL 3112321, at *4 (E.D. Cal. Sept. 23, 2009).

## DISCUSSION

Where, as here, the plaintiff is proceeding pro se, the Court has "an obligation . . . to construe the pleadings liberally and to afford the petitioner the benefit of any doubt." *Bretz v.*

United States District Court
Northern District of California

*Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (*en banc*); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed."); *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) ("[W]e continue to construe *pro se* filings liberally.").

Plaintiff's motion for summary judgment does not challenge any particular aspect of the ALJ's decision, and is largely a recitation of her current symptoms and limitations. For instance, Plaintiff states she suffers from "rheumatoid athritis," "born with a bad back," "depression," "social anxiety," and severe "panic attacks," in addition to listing new claims of disability. (Dkt. No. 18 at 2.) The Court construes these claims as a challenge to the ALJ's finding that Plaintiff's severe impairments were solely depressive disorder, anxiety disorder, alcohol dependence, and marijuana use. Plaintiff's principle complaint is that she cannot perform the jobs listed because of "rhematoid arthritis in hands, legs, arms, back, feet, ect [sic][,]" she does not have "education to perform the jobs listed," and she has "issues with people and hate being around anyone without feeling angry, anxiety and panic attachtks [and] I don't take people telling me what to do well, so it makes my medical issues worst in the workforce." (Dkt. No. 18 at 3.) The Court construes this claim as a challenge to the ALJ's finding that Plaintiff has the RFC to perform the full range of work at all exertional levels, but only simple repetitive tasks with no public contact and no responsibility for the safety of others.

### A.    The ALJ's Findings of Severe Impairment

Plaintiff appears to challenge the ALJ's Step Two conclusion that she has the following severe impairments: depressive disorder, NOS; anxiety disorder, NOS; alcohol dependence; and marijuana use. In her motion, Plaintiff also alleges that she has "rheumatoid arthritis," "a bad back," "bipolar disorder;" "hypertion [sic] disorder," which the Court understands to mean "hypertension disorder;" and side effects from "a lot of different meds. that [sic] [have] disabled [Plaintiff] to do anything without feeling down on a day to day basis." (Dkt. No. 18 at 2.) Although the ALJ considered whether rheumatoid arthritis was a severe impairment and whether Plaintiff had any specific functional limitations, the other now alleged impairments were not raised below. The Court thus first considers whether the ALJ's determination that Plaintiff did not have a severe impairment of rheumatoid arthritis is supported by substantial evidence. Second, the Court considers whether Plaintiff has established good cause for failing to present her other

alleged impairments—bipolar disorder, hypertension disorder, and medication side effects—to the Agency in the first instance.

### 1. Rheumatoid Arthritis as a Severe Impairment

Plaintiff contends that she has rheumatoid arthritis and a bad back so she cannot sit, stand, walk, or use her hands like the average person. The ALJ concluded that there were no clinical or laboratory findings to support a diagnosis of rheumatoid arthritis.

Plaintiff bears the burden of establishing each "medically determinable impairment" "through signs, symptoms, and medically acceptable clinical or laboratory findings." *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 (9th Cir. 2005); *see also* SSR 96–4p, available at 1996 WL 374187, at *1 (July 2, 1996) ("existence of a medically determinable physical or mental impairment must be established by medical evidence"). "While 'other sources' can be helpful in identifying the severity of an impairment, the existence of a 'medically determinable impairment' itself must be established by an acceptable medical source." *Wiseman v. Comm'r of Soc. Sec.*, No. 14-CV-01432, 2015 WL 4546110, at *3 (D. Or. July 28, 2015) (quoting 20 C.F.R. § 416.913(a); *see also* SSR 06–03p, available at 2006 WL 2329939, at *2 (Aug. 9, 2006) (distinction between acceptable and non-acceptable medical sources is necessary because "we need evidence from 'acceptable medical sources' to establish the existence of a medically determinable impairment")).[6] Further, "under no circumstances may the existence of an impairment be established on the basis of symptoms alone." SSR 96–4p, 1996 WL 374187 (July 2, 1996). Thus, "[a claimant] can only establish an impairment if the record includes signs—the results of medically acceptable clinical diagnostic techniques, such as tests—as well as symptoms, i.e., [the claimant]'s representations regarding his impairment." *Ukolov*, 420 F.3d at 1005 (internal quotation marks omitted).

Here, the record does not support Plaintiff's allegation of disability based on rheumatoid arthritis. Dr. Flanagan conducted a complete orthopedic evaluation at the request of the Agency

---

[6] In contrast, when considering the medical evidence regarding the *severity* of a claimant's impairments, the ALJ may not simply reject the opinion of a nurse practitioner. *See Garrison v. Colvin*, 759 F.3d 995, 1013-14 (9th Cir. 2014) ("a nurse practitioner, qualified as an other source that can provide evidence about the severity of a claimant's impairment(s) and how it affects the claimant's ability to work.")

United States District Court
Northern District of California

on November 26, 2010.  (AR 406.)   The report indicates that Plaintiff told him that she had "multijoint arthralgias and diffuse muscular pain," but "no particular joint [wa]s more painful than others." (AR 407.)  Plaintiff indicated that she had been seen by a physician in the past who told her that her joint pains were a result of arthritis.  (*Id*.)  On examination, however, Dr. Flanagan did not find anything to support Plaintiff's allegations of pain in her shoulder, wrist, hand, upper back, foot, ankle, knee, chest, and hip region.  (*Id*. at 410.)  He concluded that although her neck and lower back were tender to palpitation, that pain was "secondary to cervical and lumber myofacial strain respectively."  (*Id*. at 408, 410.)

Given that Dr. Flannagan is the only acceptable medical source in the record on this subject, and Plaintiff's own testimony as to the existence of rheumatoid arthritis cannot be used as evidence to establish the existence of a severe impairment, the ALJ's conclusion that Plaintiff did not have a severe impairment based on rheumatoid arthritis is supported by substantial evidence.

### 2.   Plaintiff's New Claims of Severe Impairments

With respect to Plaintiff's new claims of disability based on bipolar disorder, hypertension disorder, and side effects of medications, these are evaluated under a different standard as they were not before the ALJ.  Although Nurse Morgan's treatment notes from May 29, 2012 list "bipolar" and "HTN" (which stands for hypertension) under the "past medical history" and "assessment" sections, these are the only references to these two conditions in the record and Nurse Morgan's statements cannot be used to establish the existence of a medical impairment, *see supra*.  As for medication side effects, the only evidence in the record regarding this is Plaintiff's testimony before the ALJ that Vicodin makes her nauseous, but there is no indication as to whether she takes it notwithstanding the side effects or how often she takes it, nor is there evidence in her medical records relating to issues with medication side effects.

In reviewing social security appeals, a court may not consider evidence outside of the administrative record, or acquire evidence and make factual determinations.  "The role of the courts is wholly appellate." *Ellis v. Bowen*, 820 F.2d 682, 684 (5th Cir. 1987).  Upon receipt of new evidence, a court may only remand a case to the Commissioner for further action by the Commissioner.  42 U.S.C.A. § 405(g).  "Under 42 U.S.C. § 405(g) (Supp. 2001), in determining whether to remand a case in light of new evidence, the court examines both whether the new

United States District Court
Northern District of California

evidence is material to a disability determination and whether a claimant has shown good cause for having failed to present the new evidence to the ALJ earlier." *Mayes v. Massanari*, 276 F.3d 453, 461 (9th Cir. 2001).

Plaintiff has not satisfied either criterion. "To be material under section 405(g), the new evidence must bear 'directly and substantially on the matter in dispute.'" *Id.* at 462 (quoting *Ward v. Schweiker*, 686 F.2d 762, 764 (9th Cir. 1982). Plaintiff "must additionally demonstrate that there is a 'reasonable possibility' that the new evidence would have changed the outcome of the administrative hearing." *Mayes*, 276 F.3d at 462 (quoting *Booz v. Secretary of Health and Human Servs.*, 734 F.2d 1378, 1380-81 (9th Cir. 1983)). As for good cause, a claimant does not establish it "by merely obtaining a more favorable report once his or her claim has been denied." *Mayes*, 276 F.3d at 463. "To demonstrate good cause, the claimant must demonstrate that the new evidence was unavailable earlier." *Id.* (citing *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985) ("If new information surfaces after the Secretary's final decision and the claimant could not have obtained that evidence at the time of the administrative proceeding, the good cause requirement is satisfied")). "The claimant must also establish good cause for not having sought the expert's opinion earlier." *Mayes*, 276 F.3d at 463 (citing *Clem v. Sullivan*, 894 F.2d 328, 332 (9th Cir. 1990)).

Any request for remand to consider new bases of disability here fails because there is neither evidence to support additional bases of disability, nor is there any suggestion that these are new conditions. Nurse Morgan referenced both bipolar disorder and hypertension in her treatment notes—Plaintiff was thus aware of both conditions. Likewise, Plaintiff herself testified regarding medication side effects, but did not allege disability on that basis. Instead, Plaintiff chose not to pursue a claim of disability based on these conditions, and now seeks to bolster her allegation that the ALJ's decision was in error with additional claims of disability. But she has not offered any *evidence* as to the existence of these additional conditions in the form of a new physician's report or other diagnostic evidence. Plaintiff thus cannot demonstrate that there is any material new evidence or that she had good cause for failing to present these claims earlier.

The Court does note that based on its review of the record, Plaintiff's representative encountered significant impediments to obtaining Plaintiff's medical records from her alleged

treating physician, Dr. James. Plaintiff's counsel asked the ALJ to subpoena Dr. James for his complete records contending that the doctor's records were "material and relevant" to the extent that they can provide "information on the longitudinal nature of [Plaintiff's] conditions, especially prior to her alcohol use; the basis for her psychotropic medications; and her history of arthritis." (AR 326, 603.) The ALJ issued a subpoena to Dr. James' office following Plaintiff's hearing; however, no records were forthcoming. (AR 95.) In a letter to the ALJ following Plaintiff's hearing, her counsel stated that at the hearing the ALJ had advised counsel that she would allow Plaintiff's counsel to send the subpoena to the U.S. Attorney General's Office for enforcement if Dr. James was not forthcoming with his medical records prior to the ALJ issuing her decision.[7] (AR 603.) The ALJ nevertheless issued her decision without any further action regarding the subpoena. (*Id.*) Plaintiff's counsel objected to issuance of the decision before submitting the subpoena for enforcement by the U.S. Attorney's Office, and asked the ALJ to withdraw her decision until this occurred. (AR 604.) The ALJ does not appear to have responded and although this issue was raised to the Appeals Council, no further action was taken. (AR 339).

There is no requirement that the ALJ indefinitely hold a decision open to allow a plaintiff to submit additional evidence; rather, the plaintiff is responsible for establishing disability. *See Mayes*, 276 F.3d at 459 (explaining that plaintiff must "demonstrate that there is a 'reasonable possibility' that the new evidence would have changed the outcome of the administrative hearing."). Further, even if the ALJ erred in issuing her decision without following up regarding the subpoena, any such error was harmless as Plaintiff has not demonstrated that Dr. James had additional medical evidence probative of the disability determination. *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ will not be reversed for errors that are harmless."); *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1991) (finding harmless error where erroneous findings were inconsequential to the disability determination). Indeed, counsel's request for the subpoena indicates that she spoke to multiple people at Dr. James' office and they were unable to locate records beyond the few that were previously produced from 2010. (AR 326.) There is thus no basis to conclude that the subpoena would have actually yielded additional records supporting Plaintiff's claims of disability.

---

[7] This discussion is absent from the transcript of the hearing.

United States District Court
Northern District of California

In sum, to the extent that Plaintiff contends that the ALJ erred at Step Two in failing to find that Plaintiff had the severe impairment of rheumatoid arthritis, or that the matter should be remanded to allow her to present additional claims of disability, these arguments are unavailing. Plaintiff bears the burden of establishing disability and she has not met that burden with any of the new claims of disability.  *Ward*, 686 F.2d at 765.

### B.      Plaintiff's challenge to her RFC

The Court further construes Plaintiff's motion for summary judgment as challenging the ALJ's determination that she has the RFC for simple, repetitive work.  The "Medical Vocational Guidelines" of the Social Security regulations define RFC as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Part 404, Subpt. P, App. 2, § 200.00(c).  It is essentially a determination of what the claimant can still do despite his or her physical, mental and other limitations.  *See* 20 C.F.R. § 404.1545(a).  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including, *inter alia*, medical record, lay evidence, and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment."  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (internal citations & quotation marks omitted); 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

The ALJ concluded that Plaintiff's RFC limits her to "the full range of work at all exertional levels" "but mentally" she is limited to "simple, repetitive tasks; no interactions with the public; and no responsibility for the safety of others."  (AR 16.)  This finding was supported by the opinions of the medical expert, Dr. Glassmire, and the psychological consultant, Dr. Davis. (AR 16-17.)   For this RFC to be based on all the relevant evidence in the record, however, the ALJ had to (1) discount the medical opinion of Nurse Morgan in her RFC questionnaire, and (2) make an adverse credibility finding as to Plaintiff's claims of the intensity and limiting effects of her symptoms.  (AR 18.)  The Court addresses each of these findings in turn.

### 1.      The Weight of the Medical Opinion

The Ninth Circuit has "developed standards that guide our analysis of an ALJ's weighing of medical evidence."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). Specifically, a reviewing court must "distinguish among the opinions of three types of physicians:

1   (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the

2   claimant (examining physicians); and (3) those who neither examine nor treat the claimant

3   (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The opinion of

4   each is accorded a different level of deference, as "the opinion of a treating physician is . . .

5   entitled to greater weight than that of an examining physician, [and] the opinion of an examining

6   physician is entitled to greater weight than that of a non-examining physician." *Garrison v.*

7   *Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).

8        Plaintiff did not offer evidence from a treating physician specifically evaluating her RFC.

9   Plaintiff did, however, offer evidence from Nurse Morgan who had been Plaintiff's treating

10  medical provider for the five months preceding her hearing. (AR 595.) Nurse Morgan completed

11  two assessments of Plaintiff's ability to do work-related activities; one for her mental capacity,

12  and the other for her physical capacity; both of which indicated that Plaintiff had significant

13  limitations in her ability to work.  (AR 595-599.)

14       Under the relevant SSA regulations, "[o]nly physicians and certain other qualified

15  specialists are considered acceptable medical sources." *Ghanim v. Colvin*, 763 F.3d 1154, 1161

16  (9th Cir. 2014) (internal citations and quotation marks omitted); 20 C.F.R. § 404.1513(a).  Nurse

17  practitioners, physician's assistants, and other health professionals are considered "other sources."

18  20 C.F.R. § 404.1513(d).  "[A] nurse practitioner working in conjunction with a physician

19  constitutes an acceptable medical source, while a nurse practitioner working on his or her own

20  does not." *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996).  There is no evidence in the record

21  that Nurse Morgan was working with a physician.  *See Bidad v. Colvin*, No. 12-CV-06384-NJV,

22  2013 WL 4488695, at *3 (N.D. Cal. Aug. 20, 2013) ("Without evidence in the record that Nurse

23  Foster was closely supervised by a licensed physician when she treated Plaintiff, Nurse Foster

24  cannot be considered an 'acceptable medical source.'").

25       The ALJ must still evaluate opinions from nurse practitioners and "other sources," but

26  "may discount testimony from these 'other sources' if the ALJ gives reasons germane to each

27  witness for doing so." *Ghanim*, 763 F.3d at 1161.  Here, the ALJ noted Nurse Morgan's opinion

28  that Plaintiff has poor to no ability to adjust to a job, including understanding, remembering and

United States District Court
Northern District of California

19

carrying out simple job instructions, but gave her opinion "little weight" because "it was not consistent with the overall medical evidence." (AR 18.) While the ALJ could have been more detailed, her observation that Nurse Morgan's opinion stood in stark contrast to the rest of the medical evidence was accurate. Further, the basis for Nurse Morgan's extreme limitations is unclear as she did not identify which objective findings supported her assessed limitations or identify what, if any, other medical records she reviewed prior to providing her assessment. (AR 595-599.) The ALJ's finding that Nurse Morgan's opinion was entitled to little weight under these circumstances is thus supported by substantial evidence.

### 2. Adverse Credibility Finding

To "determine whether a claimant's testimony regarding subjective pain or symptoms is credible," an ALJ must use a "two-step analysis." *Garrison*, 759 F.3d at 1014. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, F.3d 1028, 1036 (9th Cir. 2007) (internal citations and quotation marks omitted). "Second, if the claimant meets the first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id*. (internal citations and quotation marks omitted). An ALJ is not "required to believe every allegation of disabling pain." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

A claimant's credibility is most commonly called into question where his or her complaint is about "disabling pain that cannot be objectively ascertained." *Orn*, 495 F.3d at 637. "In weighing a claimant's credibility, the ALJ may consider [her] reputation for truthfulness, inconsistencies either in [her] testimony or between [her] testimony and [her] conduct, [her] daily activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effects of the symptoms of which [she] complains." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). "To support a lack of credibility finding" about a claimant's subjective pain complaints, an ALJ must "point to specific facts which demonstrate that [the claimant] is in less pain than she claims." *Vasquez v. Astrue*, 572 F.3d 586, 591–92 (9th Cir. 2009) (internal citation and quotation omitted). In sum, where, as here, the ALJ does not find that a

United States District Court
Northern District of California

claimant was malingering, the ALJ is required to (1) specify which testimony the ALJ finds not credible, and (2) provide clear and convincing reasons supported by the record for rejecting the claimant's subjective complaints. *See Brown–Hunter v. Colvin*, No. 13–15213, 2015 WL 4620123, at *1, 5 (9th Cir. Aug. 4, 2015); *Lingenfelter*, 504 F.3d at 1036.

Here, the ALJ found that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (AR 16.)  The ALJ then reviewed the medical testimony, giving the most weight to the opinions of Dr. Glassmire and Dr. Davis as discussed above, "less weight" to the opinion of Dr. Trichter, and "little weight" to the opinion of Nurse Morgan.  (AR 17-18.)  The ALJ then noted that she did not find Plaintiff's "subjective allegations and testimony" "fully credible" based on (1) her conflicting information regarding her alcohol use and (2) the fact that she lives alone and "appears capable of caring for herself."  (AR 18.)  Because the ALJ "specifically identif[ied] the testimony she or he finds not to be credible and [] explain[ed] what evidence undermines [Plaintiff's] testimony," her adverse credibility finding was supported by substantial evidence. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001).

The ALJ cited three specific examples regarding Plaintiff's inconsistent statements as to her alcohol use each of which was and is supported by the record.  First, in November 2010, Plaintiff denied any history of substance abuse and told Dr. Trichter that she had not had a drink in a month (AR 403), which the ALJ found implausible given "the level of alcoholism reported in the record." (AR 18.)  Second, in her exam with Dr. Flannagan that same month Plaintiff denied consumption of alcohol altogether.  (AR 407.)  Third, at the hearing, Plaintiff testified that she used to drink four bottles of Mike's Hard Lemonade at a time (AR 86); however, the record shows that she was "drinking significantly more."  (AR 18.)

Plaintiff's November 2010 statements to Drs. Trichter and Flannagan are inconsistent with treatment notes from her visit with Dr. James less than two month prior.  Plaintiff told Dr. James that she drank alcohol, used marijuana daily, and described a recent incident where she punched her hand through a glass table.  (AR 578.)   This in stark contrast to her statement to Drs. Flannagan and Trichter, respectively, that she did not drink and last used drugs "when I was

younger." (AR 403, 407.)  Further, the medical evidence in the record is replete with evidence of Plaintiff's alcohol abuse.  Plaintiff visited the emergency room seven times between 2008 and 2011, and for each visit alcohol was present, whether in the diagnosis or as a modifying factor. (AR 562, 365, 377, 344, 358, 353, 348, 493.)   During one of these visits, she was placed on an involuntary psychiatric 5150 hold after she called 911 "stating she had overdosed, and wanted to die," she "was highly intoxicated," and positive for cannabinoids.  (AR 377.)  As noted by the ALJ, in an October 2008 emergency room visit, Plaintiff stated she was drinking up to two 6-packs a day (AR 571), and six months later, Plaintiff said she drank a 12-pack a day (AR 358)—both these statements stand in stark contrast to her hearing testimony.  The ALJ's identification of Plaintiff's implausible statements regarding her ability to quit drinking, and inconsistent statements regarding how much she was drinking during this time period, constitute specific, clear and convincing reasons to support the ALJ's adverse credibility finding.

Given that the ALJ's conclusion that Nurse Morgan's opinion regarding Plaintiff's limitations was entitled to less weight than the opinions of Drs. Glassmire and Dr. Davis was supported by substantial evidence, as was the ALJ's adverse credibility finding, the Court cannot find any error in Plaintiff's RFC.

## CONCLUSION

For the reasons stated above, the Court DENIES Plaintiff's motion for summary judgment (Dkt. No. 18) and GRANTS Defendant's cross-motion for summary judgment (Dkt. No. 19).

**IT IS SO ORDERED.**

Dated: September 22, 2015

JACQUELINE SCOTT CORLEY
United States Magistrate Judge